

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-77,106

**WILLIAM GEORGE DAVIS, Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM CAUSE NO. 114-0696-21
### IN THE 114TH JUDICIAL DISTRICT COURT
### SMITH COUNTY

**RICHARDSON, J., delivered the opinion for a unanimous Court.**

## O P I N I O N

In October 2021, a Smith County jury convicted Appellant of capital murder

for murdering Christopher Greenaway and one or more of John Lafferty, Ronald

Clark, and Joseph Kalina during different criminal transactions but pursuant to the

same scheme or course of conduct. *See* TEX. PENAL CODE § 19.03(a)(7)(B). Based

on the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, Sections 2(b) and 2(e), the trial court sentenced Appellant to death. TEX. CODE CRIM. PROC. art. 37.071, § 2(g).[1] Direct appeal to this Court is automatic. Art. 37.071, § 2(h).

Appellant raises thirteen points of error. Finding no reversible error, we affirm the trial court's judgment of conviction and sentence of death.

## BACKGROUND

Appellant was a cardiovascular intensive care unit (CVICU) nurse at Christus Mother Frances Hospital in Tyler, Texas. At the guilt phase of Appellant's capital murder trial, the evidence showed that, from January 2017 through January 2018, Appellant intentionally or knowingly caused the deaths of four post-operative CVICU patients (Greenaway, Lafferty, Clark, and Kalina) and seriously injured two more (Jesus Serrano and Pamela Henderson). He did so by deliberately injecting large amounts of air into the patients' arteries.

Each of the victims had been progressing well following their respective surgical procedures before they suddenly and unexpectedly suffered severe, seemingly inexplicable overnight strokes. Medical imaging showed that the victims

---

[1] Unless otherwise indicated, all subsequent citations in this opinion to "Articles" refer to the Texas Code of Criminal Procedure.

presented the same "abnormal" and "unique" pattern of brain damage. Eventually, doctors traced this distinctive pattern back to a common cause: the intentional injection of air into the patients' arterial systems. The evidence showed that each of the victims had been fitted with an "arterial line"—a small catheter placed in the victims' radial arteries, located in the victims' wrists, which allowed medical staff to monitor the victims' vital signs during and after surgery.

Appellant was not formally assigned to any of the victims' post-operative care. But of all the CVICU night-shift nurses working at the hospital during the relevant time period, Appellant was the only nurse whose shifts coincided with all of the victims' sudden downturns or "crash[es]." Appellant was also directly linked to each victim's crash. In Greenaway's case, Appellant had temporarily assumed care of Greenaway when his assigned CVICU night-shift nurse, Ben Rasberry, took a meal break. In the twenty-to-thirty minutes in which Rasberry was away, Greenaway suffered a stroke. In Lafferty's case, Appellant had temporarily assumed care of Lafferty when Lafferty's assigned CVICU nurse briefly stepped out of the room. In Clark's case, Appellant had been assigned to the care of patients in the rooms next to Clark's.

In Serrano's case, as Serrano was crashing, Appellant directed another caregiver to remove a syringe Appellant had attached to Serrano's arterial line,

because Serrano's surgeon, who was en route to the patient's room, "would be looking for it." In Henderson's case, when Henderson's assigned CVICU nurse ran into her room to stabilize her as she began to crash, the nurse witnessed Appellant "already in the room at [Henderson's] bedside." Finally, in Kalina's case, surveillance footage showed Appellant entering Kalina's room with an empty syringe moments before Kalina began to crash. After leaving Kalina's room, Appellant watched from down the hall as other medical staff rushed to Kalina's room to save him.

When hospital administrators grew suspicious of Appellant and asked him to account for his role in what had happened to the victims, Appellant gave implausible and conflicting responses. And when Appellant was finally removed from the hospital's work schedule, the unexplained crashes suddenly stopped.

At punishment, the State presented evidence from which the jury could rationally deduce that Appellant caused the deaths of three additional CVICU patients (James Blanks, James Sanders, and Perry Frank) and seriously injured three more (Gary Parker, James Wages, and Rickie Glenn). Each of these incidents occurred within the same period of time covered in the guilt phase—January 2017 through January 2018. The State also introduced a recording of a jail call that Appellant made to his ex-wife, in which Appellant made a comment strongly

suggesting that, "a year prior to" him intentionally harming patients in the CVICU, he intentionally caused the death of an elderly woman in the "neuro ICU." When Appellant's ex-wife asked, "Was she your first," Appellant answered, "Yes."

In addition, the State adduced evidence that, when Appellant was eighteen years old, he entered into a sexual relationship with a thirteen-year-old girl. On one occasion, Appellant contacted the girl while she was staying with her father and asked her to "sneak out" of her father's house and "leave with him." When the girl refused, Appellant "said that he would beat the living . . . shit out of [her] dad if [she] did not leave."

## UNANIMITY

In points of error one and two, Appellant argues that the trial court erred under state and federal law by failing to instruct the jury that, to find Appellant guilty of capital murder, it needed to "unanimously agree about the identity of the victim or victims of the non-predicate offenses."

At the close of evidence, the trial court charged the jury as follows:

> In this case, then, you must determine whether the State has proven beyond a reasonable doubt:

> 1. The defendant, in Smith County, Texas, on or about the 4th day of

August, 2017, intentionally or knowingly caused the death of Christopher Greenaway by introducing air into the arterial system of Christopher Greenaway; and

2. The defendant, in Smith County, Texas, committed one or more of the following acts:

    a. The defendant, on or about the 16th day of June[,] 2017, intentionally or knowingly caused the death of John Lafferty by introducing air into the arterial system of John Lafferty; or

    b. The defendant, on or about the 26th day of July, 2017, intentionally or knowingly caused the death of Ronald Clark by introducing air into the arterial system of Ronald Clark; or

    c. The defendant, on or about the 25th day of January, 2018, intentionally or knowingly caused the death of Joseph Kalina by introducing air into the arterial system of Joseph Kalina;

and

3. The murder of Christopher Greenaway and the murder, or murders, of John Lafferty, or Ronald Clark, or Joseph Kalina were committed during different criminal transactions but pursuant to the same scheme or course of conduct.

The jury must unanimously agree that the State proved all of the elements of this case beyond a reasonable doubt[,] except that the jury need not be unanimous as to which, if any, of the deaths of John Lafferty, Ronald Clark, and Joseph Kalina were intentionally or knowingly caused by the defendant, in the manner alleged above, so long as all members of the jury unanimously find beyond a reasonable doubt that the defendant intentionally or knowingly caused at least one

of those deaths, in the manner alleged above, in addition to the defendant having intentionally or knowingly caused the death of Christopher Greenaway in the manner alleged above.

At the charge conference, Appellant noted that the trial court's proposed charge would instruct the jurors "that they do not have to be individually unanimous on the aggravating charges so long as they are unanimous that there is an aggravating charge for which Mr. Davis is guilty." Appellant objected to this aspect of the court's charge, and the trial court overruled the objection. The jury returned a general verdict finding Appellant "guilty of capital murder, as alleged in the indictment." *See* Art. 37.07, § 1(a) ("The verdict in every criminal action must be general.").

In point of error one, Appellant argues that the trial court's instruction denied him his right to a unanimous verdict under Texas law. He contends that "it is not enough for the jury to agree only that the defendant murdered an ambiguous 'more than one person.'" In Appellant's view, the murder of each victim within a scheme or course of conduct "constitutes a separate and distinct offense subject to the unanimity requirement." We disagree.

Under the Texas Constitution and Code of Criminal Procedure, a jury must reach a unanimous verdict. *Landrian v. State*, 268 S.W.3d 532, 535 (Tex. Crim. App. 2008). The jury must agree that the defendant committed one specific crime,

but this does not mean that the jury must unanimously find that the defendant committed the crime in one specific way or even with one specific act. *Floyd v. State*, 714 S.W.3d 9, 13 (Tex. Crim. App. 2024) (citing *Landrian*, 268 S.W.3d at 535). A jury must unanimously agree on each element of the crime in order to convict. *Id.* at 8 (citing *Ngo v. State*, 175 S.W.3d 738, 747 (Tex. Crim. App. 2005)).

In the unanimity context, whether different theories of committing a crime constitute different offenses or alternate methods of committing the same offense usually depends on the focus or "gravamen" of the statutory language in question. *Davis v. State*, 313 S.W.3d 317, 342 (Tex. Crim. App. 2010). And we have consistently held that the gravamen of capital murder is "intentionally (or knowingly) causing a death, plus any one of various different types of aggravating elements." *See, e.g.*, *Gardner v. State*, 306 S.W.3d 274, 302 (Tex. Crim. App. 2009). This holding "applies equally to all alternate theories of capital murder contained within Penal Code § 19.03, whether they are found in the same or different subsections, so long as the same victim is alleged for the predicate murder." *Id.* (internal quotation marks and brackets omitted) (quoting *Gamboa v. State*, 296 S.W.3d 574, 583–84 (Tex. Crim. App. 2009)). The upshot is that, "[f]or capital murder prosecutions . . . a jury charge may disjunctively allege different

capital murder theories with respect to the same [predicate] victim." *See Davis*, 313 S.W.3d at 342.

This holding settles the issue before us. The trial court's charge in this case properly set out a single offense of capital murder (murder of Greenaway plus . . .) with "different capital murder theories" alleged disjunctively ( . . . murder of Lafferty *or* Clark *or* Kalina, committed pursuant to the same scheme or course of conduct). *See id.* The court's charge further instructed the jury to "unanimously agree that the State proved all of the elements of this case beyond a reasonable doubt." Appellant therefore received the unanimous verdict guaranteed him under Texas law.

Appellant attempts to distinguish the aggravating element of his capital murder prosecution, set out in Texas Penal Code Section 19.03(a)(7)(B), from other possible capital murder aggravators. He cites our opinion in *Ex parte Milner*, a double jeopardy case, in which we observed that, "[w]hile all other [aggravating elements] of capital murder allow for a prosecution for each individual victim," capital murder prosecutions under Subsections (a)(7)(A) and (a)(7)(B) "require a minimum of two victims." 394 S.W.3d 502, 507 (Tex. Crim. App. 2013). And because "the murder of one individual is a different offense from the murder of a different individual," *see Johnson v. State*, 364 S.W.3d 292, 296 (Tex. Crim. App.

2012), Appellant concludes that "the victims alleged in a multiple homicide prosecution under section 19.03(a)(7) are not alternative theories or different methods or means of committing the same [capital murder]." Rather, they are "separate offenses involving separate incidents," making each murder "subject to the unanimity requirement."

Appellant is mistaken. First, *Milner* explained that "unlike all other capital murders, which require only one victim," capital murder prosecutions under Subsections (a)(7)(A) and (a)(7)(B) "require at least two murders *to constitute a single offense.*" *Id.* at 508 (emphasis added). Indeed, this observation was central to *Milner*'s reasoning: "Because the killing of at least two people allows the state to charge a single count of capital murder under section 19.03(a)(7)(B), the allowable unit of prosecution for this statute is not each individual, but the killing of more than one individual." *Id. Milner* thus cuts against Appellant's argument. *See, e.g.*, *Gamboa*, 296 S.W.3d at 583 (noting that "two closely intertwined strands of our jurisprudence—jury unanimity and double jeopardy—address the same basic question: whether different legal theories of criminal liability comprise different offenses or alternate methods of committing the same offense" (internal quotation marks omitted)).

Second, Appellant is wrong to suppose that "separate offenses involving separate incidents," alleged alongside the same predicate capital murder victim, would nevertheless set out distinct capital murders. In *Davis v. State*, the defendant was tried for capital murder on the theory that he murdered Regina Lara in the course of burglary of a habitation. *See* 313 S.W.3d at 341. In turn, there were two legal theories under which the defendant might have committed burglary: "(1) burglary based upon theft of property from Regina, or (2) burglary based upon the sexual assault of [another person named] R.M." *Id.* at 342. The trial court instructed the jurors that they "need not be unanimous as to the way that the burglary of a habitation was committed so long as each of you individually believes beyond a reasonable doubt that the defendant committed the intentional murder of Regina Lara in the course of committing 'Burglary of a Habitation.'" *Id.* at 341.

The defendant argued that these alternate theories of burglary actually set out alternate offenses of capital murder, "because there were two victims (Regina and R.M.) and two underlying offenses connected with the unlawful entry (theft and sexual assault)." *Id.* at 342. But we disagreed: "Nothing prohibits a single capital murder from containing alternate underlying offenses that are the same statutory offense but with different victims or different underlying methods of commission, so long as the same victim is alleged with respect to the predicate

murder." *Id.* So, we concluded, even if the defendant was right that "there were two underlying burglaries . . . there would still be only one capital murder, based upon the murder of Regina." *Id.*

The same is true here. The jury charge in this case no doubt set out multiple murder victims—one predicate murder victim plus three aggravating murder victims. But that only means that this "single capital murder" involved alternate underlying offenses based upon "the same statutory offense but with different victims." *See id.* And because "the same victim [wa]s alleged with respect to the predicate murder," the jury charge in this case properly instructed the jury to reach a unanimous decision on "a single capital murder." *See id.* Point of error one is overruled.

In point of error two, Appellant argues that, to the extent Texas law would permit a general verdict of "guilty" under these circumstances, Texas law conflicts with the United States Constitution. *See* U.S. CONST. amend. VI, XIV; *Ramos v. Louisiana*, 590 U.S. 83, 93 (2020) (partial plurality op.) (holding that "the Sixth Amendment's right to a jury trial requires a unanimous verdict to support a conviction . . . in state court"). Appellant notes that there are constitutional limits "on a State's capacity to define different courses of conduct . . . as merely alternative means of committing a single offense." *See Schad v. Arizona*, 501 U.S.

624, 631–32 (1991) (plurality op.), *abrogated on other grounds by Edwards v. Vannoy*, 593 U.S. 255, 265 n.4 (2021). And, in Appellant's view, Penal Code Section 19.03(a)(7)(B) exceeds those limits. He thus compares the instant capital murder prosecution to "an indictment charging that the defendant assaulted either X on Tuesday or Y on Wednesday." *See id.* at 651 (Scalia, J., concurring) (arguing that the Constitution "would not permit" such an indictment). Indeed, Appellant maintains that the instant prosecution "created even greater unfairness" than the hypothetical "X or Y" indictment, because the aggravating murders in this case "occurred not merely a day apart, but several months."

When we consider whether "unanimity on the alternate means or modes" of committing an offense is "required as a matter of due process," we ask "whether the acts or omissions that combine to establish [the] offense are 'basically morally and conceptually equivalent.'" *See, e.g.*, *O'Brien v. State*, 544 S.W.3d 376, 383–84 (Tex. Crim. App. 2018) (quoting *Jefferson v. State*, 189 S.W.3d 305, 313–14 (Tex. Crim. App. 2006)). Among other things, we consider whether the acts or omissions "share a common nexus." *See Contreras v. State*, 312 S.W.3d 566, 585 (Tex. Crim. App. 2010); *see also O'Brien*, 544 S.W.3d at 394 (noting the existence of the requisite "temporal connection or nexus").

When a defendant is alleged to have committed capital murder under Penal Code Section 19.03(a)(7)(B), and the indictment sets out multiple alternate aggravating murders in addition to a predicate murder, the aggravating murders will invariably share at least two common nexuses. First, as with every capital murder theory set out in Section 19.03, the aggravating murders will be alleged alongside a single "predicate" murder. *See, e.g.*, *Saenz v. State*, 451 S.W.3d 388, 390 (Tex. Crim. App. 2014) ("The capital-murder statute requires a predicate murder[.]"). Second, the indictment in such cases will necessarily allege that the murders were committed "pursuant to the same scheme or course of conduct." Tex. Penal Code § 19.03(a)(7)(B). Here, the trial court properly charged the jury on a single predicate murder: the murder of Christopher Greenaway. The court further instructed the jury that, to convict Appellant of capital murder as alleged in the indictment, the jury needed to discern from the evidence a unifying "scheme or course of conduct." *See id.*

We therefore conclude that the multiple alternate aggravating murders at issue in this case are morally and conceptually equivalent. As a result, the trial court did not violate Appellant's federal constitutional rights when it instructed the jurors that they need not unanimously agree on the "preliminary factual issues" underlying their verdict. *Accord Kitchens v. State*, 823 S.W.2d 256, 258 (Tex. Crim.

App. 1991) (quoting *Schad*, 501 U.S. at 632). Appellant received the unanimous verdict guaranteed him by the United States Constitution. *See Ramos*, 590 U.S. at 93. Point of error two is overruled.

**VOIR DIRE**

In point of error three, Appellant argues that the trial court denied him "the opportunity to conduct 'meaningful voir dire' in violation of . . . the Sixth and Fourteenth Amendments" to the United States Constitution. In Appellant's view, the trial court erred by: (A) failing to follow Appellant's pretrial "Memorandum of Law in Support of a Full, Fair[,] and Constitutional Voir Dire"; (B) denying Appellant's pretrial "Motion to Consider *Lockett v. Ohio*, *Morgan v. Illinois*, and *Eddings v. Oklahoma* Relating to Qualified Jurors in Capital Cases"; (C) sustaining the State's objections to certain questions Appellant posed to a prospective juror; (D) overruling Appellant's "objection to close-ended, general fairness, follow-the-law questions by the State"; and (E) sanctioning the State's "repeated use of a 'mercy killing' hypothetical."

First, Appellant suggests that the trial court erred by failing to abide by the framework for voir dire set out in his pretrial "Memorandum of Law in Support of a Full, Fair[,] and Constitutional Voir Dire." At a pretrial motions hearing, the trial court called up Appellant's memorandum and stated, "The Court has considered

the Memorandum. It doesn't seek specific relief in its title, and the Court is passing

that." Appellant did not object to the trial court's remark, and the trial court

moved on to the next pretrial motion. Because Appellant did not obtain an adverse

ruling on his Memorandum or object that the trial court had refused to rule on it,

he failed to preserve error. *See* TEX. R. APP. P. 33.1(a).

Second, Appellant contends that the trial court erred to deny his pretrial

"Motion to Consider *Lockett v. Ohio*, *Morgan v. Illinois*, and *Eddings v. Oklahoma*

Relating to Qualified Jurors in Capital Cases." After laying out excerpts from the

decisions listed in the motion's style, the motion asserted that:

> Based on consideration of these cases, a defendant has a right in the
> jury selection process to discuss the mitigating evidence that he feels is
> relevant in his case with each prospective juror. In doing so, the
> defendant can get to understand the beliefs of the prospective juror as
> they apply in certain aspects of the defendant's life, such as mental
> illness, alcoholism or drug usage, physical/sexual/or mental abuse
> suffered as a child, being raised in poverty, etc.
>
> * * *
>
> A prospective juror who admits that the particular proposed
> mitigating evidence is not anything that he/she would consider in . . .
> answering the mitigation Special Issue is not qualified to sit on the
> jury, and a defense challenge for cause to such a juror should be
> sustained.

At the pretrial motions hearing mentioned above, the State explained that, while it

did not "mind the Court considering" the cases listed in the motion's style, it did

not "agree with the Defense's characterization of th[ose] cases." The trial court then ruled, "The Court is denying the relief as far as the characterization."

On appeal, Appellant argues that this pretrial ruling precluded him from pursuing "constitutionally required lines of questioning regarding mitigating evidence." Assuming Appellant preserved error, his argument lacks merit. Contrary to Appellant's motion, "[t]he law does not require a juror to consider any particular piece of evidence as mitigating; all the law requires is that a defendant be allowed to present relevant mitigating evidence and that the jury be provided a vehicle to give mitigating effect to that evidence if the jury finds it to be mitigating." *Hall v. State*, 663 S.W.3d 15, 40 (Tex. Crim. App. 2021) (internal quotation marks and brackets omitted) (quoting *Raby v. State*, 970 S.W.2d 1, 3 (Tex. Crim. App. 1998)). "Therefore, a trial court may lawfully refuse to allow a defendant to ask venire members questions based on facts peculiar to the case on trial, including questions about particular mitigating evidence." *Id.* (internal quotation marks omitted) (quoting *Raby*, 970 S.W.2d at 3). Because Appellant's motion mischaracterized the law, the trial court did not err to deny it.

Third, Appellant complains that the trial court erroneously sustained the State's objections to certain questions Appellant posed to prospective juror Lynch. At individual voir dire, while exploring the subject of mitigating evidence,

Appellant began to ask Lynch, "You don't have to think of any mitigating—any things that you think might be mitigating, but do[es] anything come to mind that . . . ." The State interrupted Appellant's question, objecting, "Asking what a juror believes is mitigating is improper." The trial court sustained the State's objection. Appellant then asked Lynch, "[I]f you heard evidence relevant to that second question that a defendant had a family that loved him, would that be something that you could give consideration to?" The State began to object again, and the trial court promptly announced, "Sustain that objection. . . . I sustained it as to the specific examples of what he would or would not find mitigating."

On appeal, Appellant contends that, in sustaining the State's objections to these questions, the trial court prevented him from "eliciting sufficient information to ascertain whether Lynch would follow the law and consider the mitigating evidence he intended to present." A trial court's ruling on the propriety of a particular question at voir dire is reviewed for an abuse of discretion. *See Sells v. State*, 121 S.W.3d 748, 755 (Tex. Crim. App. 2003). A trial court abuses its discretion when it prohibits a proper question about a proper area of inquiry. *Id.* at 755–56. A "juror's views on an issue applicable to the case" can be a proper area of inquiry. *See id.* at 756. "However, an otherwise proper question is impermissible if the question attempts to commit the juror" to rendering "a particular verdict based

on particular facts." *Id.* A trial court does not abuse its discretion when it prohibits such "improper commitment questions." *See, e.g.*, *Hall*, 663 S.W.3d at 40.

Here, the trial court could have reasonably concluded that Appellant's first question (". . . do[es] anything come to mind . . .") sought to elicit the specific kind of evidence that Lynch would regard as mitigating. And because "questions . . . that ask the prospective juror to set the hypothetical parameters for his decision-making" are improper commitment questions, the trial court did not abuse its discretion to sustain the State's objection to this question. *See id.* (internal quotation marks and brackets omitted) (quoting *Standefer v. State*, 59 S.W.3d 177, 180 (Tex. Crim. App. 2001)).

As for Appellant's second question (". . . if you heard evidence . . . that a defendant had a family that loved him . . ."), the trial court could have reasonably concluded that it foreshadowed evidence that Appellant hoped to introduce at the punishment phase. A trial court "may lawfully refuse to allow a defendant to ask venire members questions based on facts peculiar to the case on trial, including questions about particular mitigating evidence." *See id.* (internal quotation marks omitted) (quoting *Raby*, 970 S.W.2d at 3). True, Appellant's second question asked whether Lynch "could give consideration to" a specific kind of evidence. But "the word 'consider' does not prevent a question from being a commitment question."

*Standefer*, 59 S.W.3d at 180. The trial court did not abuse its discretion to prohibit Appellant's second question.

Fourth, Appellant suggests that the trial court erred when it overruled his "objection to close-ended, general fairness, follow-the-law questions by the State." After Lynch's individual voir dire, Appellant read an objection into the record in which he protested the State's "[u]se of leading questions throughout voir dire to elicit 'yes' answers that prospective jurors can follow the law and keep an open mind and wait and listen coupled with unrealistic hypothetical scenarios." Citing the United States Supreme Court's decision in *Morgan v. Illinois*, 504 U.S. 719 (1992), Appellant argued that "the use of leading questions throughout voir dire . . . to elicit 'yes' answers that prospective jurors can follow the law and keep an open mind . . . is [a] meaningless exercise and violates the Defendant's rights[.]" The trial court overruled this objection but granted Appellant a running objection on this basis.

On appeal, Appellant complains that, "[a]fter granting a running objection to the State's use of general 'follow-the-law' questions . . . the trial court nevertheless allowed voir dire to proceed in this manner." But Appellant does not identify any subsequent questioning that he regards as falling within the objection he read into the record. Accordingly, this portion of point of error three is inadequately briefed.

*See* TEX. R. APP. P. 38.1(i) ("The brief must contain . . . appropriate citations to authorities *and to the record*.") (emphasis added). We will not make Appellant's argument for him. *See Heiselbetz v. State*, 906 S.W.2d 500, 512 (Tex. Crim. App. 1995) ("[W]e will not brief appellant's case for him.").

Fifth and finally, Appellant argues that the trial court should not have permitted the State to "repeatedly reference[] a hypothetical situation of a 'mercy killing' while examining prospective jurors." But Appellant has not directed us to any point in the record in which he objected to the State's hypothetical. Appellant failed to preserve error. *See* TEX. R. APP. P. 33.1(a). We overrule point of error three.

## GUILT PHASE EXTRANEOUS OFFENSES

In point of error four, Appellant contends that at the guilt phase the trial court erroneously admitted evidence of extraneous crimes. *See* TEX. R. EVID. 404(b). He specifically complains about evidence suggesting that, in the course of the instant capital murder scheme, he harmed (but did not kill) CVICU patients Serrano and Henderson by introducing air into their arterial lines.

In his opening statement, Appellant argued that "it's not uncommon for people to have strokes and other problems after heart surgery." He continued, "[I]f someone has a watershed stroke . . . [t]hat doesn't mean it was air, and . . . if it

was air, it doesn't mean it was intentional." Appellant later argued, "Sometimes people die in a hospital."

During the guilt phase, Appellant occasionally cross-examined the State's witnesses so as to suggest the possibility of accident, mistake, or happenstance. For instance, Appellant asked CVICU nurse Rasberry whether strokes are one of the known "risk factors" following heart surgery. When discussing arterial lines with Rasberry, Appellant referred to "human error . . . [b]e it intentional or accidental." When cross-examining CVICU nurse Wendy Stone about Appellant's failure to inform hospital staff of his presence in Kalina's room, Appellant observed that, "If you did something accidentally or on purpose, you wouldn't want to be associated with a bad outcome." Appellant later asked Stone whether "[s]ometimes bad things happen to sick people[.]"

In response to this argument and questioning, the State ultimately proffered evidence that Appellant harmed Serrano in August 2017 and Henderson in November 2017 by introducing air into their arterial lines. Appellant objected to this evidence under Rules of Evidence 404(b) and 403. The trial court did not rule on Appellant's Rule 403 objection, but it expressly overruled his Rule 404(b) objection.

As a result of the trial court's ruling, the State: (A) called six witnesses who would not have otherwise testified at the guilt phase to give testimony related to Serrano and Henderson; (B) recalled four witnesses who had previously testified to give additional testimony related to Serrano and Henderson; and (C) asked additional questions of six witnesses whom the State would have called in any event (because they had knowledge of the circumstances surrounding the indicted offense). As Appellant notes in his brief, the Serrano and Henderson evidence also involved a large number of additional medical records.

On appeal, Appellant argues that, by admitting evidence of the Serrano and Henderson incidents, the trial court violated Rule of Evidence 404(b). He notes that the State proffered this evidence "primarily under the Doctrine of Chances." And, as we have said, "similarity is crucial to the doctrine of chances." *Valadez v. State*, 663 S.W.3d 133, 141 (Tex. Crim. App. 2022). Here, Appellant continues, "patients experiencing medical emergencies in an intensive care unit in the presence of a nurse is precisely the sort of generic occurrence that the doctrine of chances is intended to exclude." Appellant also complains that, although "the State told the trial court that the extraneous offenses would take little time" to develop, the evidence consumed "six days of trial and eight volumes of the Reporter's Record," in addition to thousands of pages of medical records.

We begin by addressing Appellant's complaints about the time it took to develop this evidence and the volume of medical records involved. These complaints are more suitable for an argument under Rule of Evidence 403. *See Hart v. State*, 688 S.W.3d 883, 893 (Tex. Crim. App. 2024) (explaining that one factor considered in a Rule 403 analysis "focuses on the time needed 'to develop the evidence, during which the jury [is] distracted from consideration of the indicted offense'" (quoting *State v. Mechler*, 153 S.W.3d 435, 441 (Tex. Crim. App. 2005))). Although Appellant objected to this evidence under Rule 403, he did not secure an adverse ruling. *See* TEX. R. APP. P. 33.1. This aspect of Appellant's point of error is not preserved for our review.

As for Appellant's argument that the Serrano and Henderson incidents constituted inadmissible propensity evidence, we are unpersuaded. "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." TEX. R. EVID. 404(b)(1). But such evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." *Id.* R. 404(b)(2). These other purposes may, on the right set of facts, include the "doctrine of chances." *See, e.g.*, *Valadez*, 633 S.W.3d at 141–42. "The admissibility of evidence

under the doctrine of chances depends on a showing of highly unusual events that are unlikely to repeat themselves inadvertently or by happenstance." *Id.* at 141. If presented with a proffer under the doctrine of chances, the trial court must decide whether the extraneous incidents were "highly unusual or exactly the same as the charged offense." *Id.* at 143.

A trial court's decision to admit or exclude evidence is reviewed for an abuse of discretion, and there is no abuse of discretion if the trial court's ruling is within the zone of reasonable disagreement. *Valadez*, 663 S.W.3d at 143. Further, if the trial court's ruling is correct on any applicable theory of law, it will not be disturbed. *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009).

We have never attempted to catalogue the circumstances under which extraneous incidents may be thought of as "highly unusual or exactly the same as the charged offense," *see id.*, and we will not attempt to do so here. As in other contexts, "[t]he process cannot be wholly objictified." *See Montgomery v. State*, 810 S.W.2d 372, 391 (Tex. Crim. App. 1990) (op. on reh'g). But in this case, we conclude that the trial court did not abuse its discretion in admitting the challenged evidence. Within the zone of reasonable disagreement, the trial court could have concluded that the Serrano and Henderson incidents so closely resembled the indicted offense that they bore a relevance to the underlying charge that went

beyond mere character conformity. If only by a nudge, the Serrano and Henderson incidents tended to show that what happened to Greenaway, Lafferty, Clark, and Kalina was not a function of happenstance.

For instance, CVICU nurse Natalie Kelley testified that she was assigned to Serrano's care when he experienced an unexpected stroke. Serrano had been recovering from his triple bypass surgery normally, but at one point in the night, when Kelley was not in Serrano's room, she heard Appellant calling out, "Mr. Serrano, Mr. Serrano." Kelley soon discovered that Serrano had "deteriorated"— and Appellant, who was not assigned to Serrano's care, was already in Serrano's room when Kelley arrived. When Kelley joined Appellant in Serrano's room, she noticed a ten-milliliter syringe attached to Serrano's arterial line. After Serrano's surgeon was notified of his condition, Appellant told Kelley to "remove the syringe from the art-line because [Serrano's surgeon] would be looking for it." Dr. Charles Crum testified that Serrano's brain imaging revealed an injury pattern similar to Greenaway's, Lafferty's, Clark's, and Kalina's— "[c]onsistent with arterial air embolism."

CVICU nurse Korde Smith testified that he was "charting" outside Henderson's room when a monitor alerted him that her blood pressure had spiked. When Smith ran into Henderson's room to intervene, Appellant "was already in

the room at the bedside." Smith, not Appellant, was Henderson's assigned CVICU nurse. According to Smith, "Immediately . . . after Ms. Henderson had her decline," Appellant gave an implausible explanation for why he was already in her room. Crum testified that, as with Greenaway, Lafferty, Clark, Kalina, and Serrano, Henderson's brain imaging displayed an injury pattern similar to Greenaway's, Lafferty's, Clark's, and Kalina's—again, "[c]onsistent with arterial air embolism."

These incidents undermined the defensive theory that "[s]ometimes people die in a hospital." Kelley and Smith were able to place Appellant inside the rooms and at the bedsides of Serrano and Henderson as they started to crash. This evidence was largely lacking from the proof pertaining to the victims named in the indictment, undermining Appellant's suggestion that this evidence served only to impugn his character. Further, multiple witnesses testified to the extreme rarity of what happened to the various victims. First, there was testimony that it is uncommon for neurologically progressing post-operative cardiovascular patients to suddenly crash. Second, there was testimony that it is uncommon for strokes to be the cause of a post-operative crash. Third, there was testimony that the brain injury pattern shared by the various victims was "so unique and . . . abnormal . . . that you [could] take it and publish it in a . . . peer-reviewed medical journal tomorrow."

If this evidence raised an inference that Appellant had a propensity for wrongdoing, it had relevance beyond that inference. *See Montgomery*, 810 S.W.2d at 387 (a trial court may admit evidence over a Rule 404(b) objection if "the 'other crime, wrong, or act' has relevance apart from character conformity"). Within the zone of reasonable disagreement, the trial court could have concluded that the Serrano and Henderson incidents made a fact of consequence in this proceeding—that the strokes experienced by Greenaway, Lafferty, Clark, and Kalina did not "just happen," but were intentionally caused to happen by Appellant—more likely than it would have been without the evidence. The evidence directly linked Appellant to the rare brain injury patterns observed in Serrano's and Henderson's cases, and those patterns were present in the indicted-offense victims' cases. The trial court did not abuse its discretion in overruling Appellant's Rule 404(b) objection. Point of error four is overruled.

**LESSER INCLUDED OFFENSES**

In points of error five and six, Appellant alleges that the trial court erred, under state and federal law, "by refusing to charge the jury with a lesser-included offense instruction as to the Kalina offense." Specifically, Appellant argues that he was entitled to lesser included offense instructions on the offenses of manslaughter

and criminally negligent homicide, with Kalina as the named victim on each offense.

Before the charge conference, the trial court provided the parties with a copy of the court's proposed charge and asked them to "take a look at that over the next couple of days." Appellant quickly informed the trial court that, "Obviously, we'll be requesting lesser included offenses."

On the morning of the charge conference, Appellant provided the trial court with a proposed charge on lesser included offenses. Appellant's proposed charge contained instructions on the offenses of murder, manslaughter, and criminally negligent homicide, with Greenaway as the named victim on each offense.

At the charge conference, the trial court ruled:

> I think all of the testimony was that anybody with any kind of medical knowledge would have known that injecting air into an arterial line was reasonably certain to cause death. And so there would be—I don't—I don't think we get to manslaughter based on those facts or criminally negl[igent] homicide. And so for those reasons, I would deny the request for those two lessers. The lesser of murder is included, though.

The trial court then asked the State whether it had "any objection to the murder lesser . . . *[a]s to Mr. Greenaway*." (Emphasis added). The State had no objection.

Defense counsel then directed the trial court's attention to the evidence that, in his view, supported lesser included offense instructions on manslaughter and criminally negligent homicide:

> [B]oth in the statement with [a hospital administrator] and in the statement to—over the phone with the officer, [Appellant] admits to—to flushing the line. And if you admit to flushing a line, you're saying, 'I used saline to flush the line.' He's admitting to an act, but he's admitting to an act that he didn't think was criminal.

The following exchange then occurred:

> [Prosecutor]: The statements [defense counsel] references were in reference to Mr. Kalina's case—
>
> [Defense counsel]: That's true.
>
> [Prosecutor]: —which would not be a lesser included since Mr. Greenaway is the predicate murder for this case.
>
> THE COURT: All right. Then—then I'm going to stick with those rulings as we've got them.

Ultimately, the court's charge included an instruction on the lesser included offense of murder, with Greenaway as the named victim. The court did not charge the jury on any other potential lesser included offenses.

In point of error five, Appellant contends that "[t]he trial court's refusal to instruct the jury on the requested lesser-included offenses with respect to Joseph Kalina was erroneous" under state law. But the record shows that Appellant did not ask the trial court for lesser included offense instructions with Kalina as the

named victim—he asked for such instructions with Greenaway as the named victim. Therefore, manslaughter and criminally negligent homicide as to Kalina were not "applicable to the case." *See Tolbert v. State*, 306 S.W.3d 776, 781–82 (Tex. Crim. App. 2010) (holding that a jury instruction on a potential lesser included offense "[i]s not 'applicable to the case' absent a request by the defense for its inclusion in the jury charge"). And because the statute governing jury instructions requires the trial court to deliver "a written charge distinctly setting forth the law applicable to the case," the trial court's instructions in this case did not violate state law. *See* Art. 36.14. Point of error five is overruled.

In point of error six, Appellant argues that "[t]he trial court's refusal to instruct the jury as requested on lesser-included offenses related to a non-predicate offense violated [his] Eighth and Fourteenth Amendment right to lesser included offense instructions in a capital case." He cites the United States Supreme Court's decision in *Beck v. Alabama*, 447 U.S. 625 (1980), which "held unconstitutional a state statute that prohibited lesser included offense instructions in capital cases, when lesser included offenses to the charged crime existed under state law and such instructions were generally given in noncapital cases." *Hopkins v. Reeves*, 524 U.S. 88, 90 (1998).

As mentioned, at trial, Appellant did not request manslaughter or criminally negligent homicide instructions with Kalina as the named victim. So for us to reverse Appellant's conviction or sentence on *Beck* grounds, we would first have to conclude that the Eighth and Fourteenth Amendments make certain lesser included offense instructions "law applicable to the case" even when the defendant does not request those instructions at trial. *See* Art. 36.14. This, we decline to do.

First, a trial court does not err under *Beck* "to refuse to instruct the jury on . . . lesser included offenses" when the defendant "knowingly chose" to forego those instructions. *See Spaziano v. Florida*, 468 U.S. 447, 457 (1984), *overruled on other grounds by Hurst v. Florida*, 577 U.S. 92, 101 (2016). And under Texas law, the decision whether to pursue a lesser included offense instruction is "a matter of trial strategy and tactics." *See Tolbert*, 306 S.W.3d at 781 & n.9. On this record, absent any allegation of ineffective assistance of counsel, we must presume that Appellant's decision to pursue lesser included offense instructions with respect to Greenaway, but not Kalina, represented a deliberate trial strategy. In other words, Appellant "knowingly chose" not to request lesser included offense instructions as to Kalina. *Spaziano*, 468 U.S. at 457. He cannot now accuse the trial court of violating *Beck*. *See id.*

Second, *Beck* does not "require[] state trial courts to instruct juries on offenses that are not lesser included offenses of the charged crime under state law." *Hopkins*, 524 U.S. at 90–91. And under this state's law, unrequested lesser included offense instructions generally are not "law applicable to the case." *See* Art. 36.14; *Tolbert*, 306 S.W.3d at 781–82. We note also that Texas's capital sentencing scheme is fundamentally different from the one the Supreme Court found wanting in *Beck*. *See Hopkins*, 524 U.S. at 94–99 (cataloguing the "critical" distinctions between Nebraska's capital sentencing scheme and the sentencing scheme in *Beck*). In any event, we do not understand *Beck* to transform otherwise-inapplicable lesser included offenses into "law applicable to the case." *Accord id.* at 90–91; Art. 36.14.

Finally, *Beck* expressed a concern that the "unavailability of [a] third option of convicting on a lesser included offense" might "encourage the jury to convict for an impermissible reason—its belief that the defendant is guilty of some serious crime and should be punished." 447 U.S. at 642. But here, the jury had a "third option"—it could convict Appellant of the noncapital murder of Greenaway. *Beck*'s "all-or-nothing" concern is therefore absent from this case. *See Spaziano*, 468 U.S. at 455 ("The goal of the *Beck* rule . . . is to eliminate the distortion of the

factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence."). Point of error six is overruled.

**GUILT PHASE CLOSING ARGUMENT**

In point of error seven, Appellant complains that "[t]he State engaged in improper closing argument at the merits phase of trial by disparaging the defense as 'just parroting Mr. Davis' and accusing defense counsel of 'misdirection and deception.'"

As part of its guilt phase closing argument, the State began to list the times that Appellant had "lied about his involvement" in harming the victims in this case. Appellant did not object to these arguments. Eventually, the following exchange took place:

> [Prosecutor]: Now, I want to briefly talk about the defense. So what the defense has been is just parroting Mr. Davis, essentially. It's misdirection and deception. Misdirection and deception.

> [Defense counsel]: I'm going to object. That's striking over the shoulder of the Defendant.

> THE COURT: Overruled.

> [Prosecutor]: All of our evidence proves he's guilty. But the Defense's strategy has been: Don't look over here; look over here; look over here; look here; let's look at something else. Let's not look at the facts. Let's not listen to his lies, Mr. Davis's lies. Let's not watch the video. Let's look at all this misdirection, okay?

The State later urged the jury to reject the testimony of one of Appellant's experts because the expert had "come[] in here and trie[d] to deceive you[.]" Appellant did not object to this argument. Neither did Appellant object when the State suggested that the same expert was "either . . . trying to mislead you, or he doesn't know what he's talking about."

On appeal, Appellant asserts that the State's argument accusing "the defense" of "parroting Mr. Davis" and "misdirection and deception" was improper. Under our law, "a prosecutor runs a risk of improperly striking at a defendant over the shoulder of counsel when the argument is made in terms of defense counsel personally and when the argument explicitly impugns defense counsel's character." *See Mosley v. State*, 983 S.W.2d 249, 259 (Tex. Crim. App. 1998) (op. on reh'g). We will assume in Appellant's favor that: (A) the State's initial reference to "the defense" was directed at defense counsel personally; and (B) the trial court erred to overrule Appellant's objection. *See id.*

Even so, we have held that trial errors of this type are subject to harm analysis under Texas Rule of Appellate Procedure 44.2(b). *See id.* Under that rule, "[a]ny [non-constitutional] error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." TEX. R. APP. P. 44.2(b). We have further explained:

> To determine whether appellant's substantial rights were affected, we balance the severity of the misconduct (i.e., the prejudicial effect), any curative measures, and the certainty of conviction absent the misconduct. Further, in evaluating the severity of the misconduct, we must assess whether the jury argument is extreme or manifestly improper by looking at the entire record of final arguments to determine if there was a willful and calculated effort on the part of the State to deprive appellant of a fair and impartial trial.

*Brown v. State*, 270 S.W.3d 564, 572–73 (Tex. Crim. App. 2008) (cleaned up).

In this case, we conclude that the alleged error did not affect Appellant's substantial rights. First, any misconduct here was mild. While the State may have indirectly accused defense counsel of engaging in "misdirection and deception," it did not "directly accuse [counsel] of lying." *See Mosley*, 983 S.W.2d at 260. The State did not "suggest that any evidence was manufactured" or "inject new facts into the record." *See id.* It did not suggest that counsel had a monetary incentive to secure an acquittal. *See Gomez v. State*, 704 S.W.2d 770, 771 (Tex. Crim. App. 1985) (reversing a conviction because, among other improper comments, the prosecutor suggested that counsel had been "paid to get this defendant off the hook"). And it did not use snide or childish language to characterize counsel or counsel's strategy. *See Fuentes v. State*, 664 S.W.2d 333, 337 (Tex. Crim. App. 1984) (reversing a conviction because, among other improper comments, the prosecutor facetiously referred to counsel as "Mr. Ethics").

Further, viewing the "entire record of final arguments," we do not discern "a willful and calculated effort on the part of the State to deprive appellant of a fair and impartial trial." *See Brown*, 270 S.W.3d at 572–73. The record shows that the State did not dwell on counsel's supposed "strategy" of "misdirection and deception." Appellant asserts that the State's later argument relating to Appellant's trial expert ("And he comes in here and tries to deceive you") was part of the same "linguistic motif" as the "misdirection and deception" argument. We disagree. There is a difference between accusing a *witness* of deception and accusing *opposing counsel* of deception. *See Satterwhite v. State*, 858 S.W.2d 412, 425 (Tex. Crim. App. 1993) ("A prosecutor is allowed to argue that the witnesses for the defense are not worthy of belief."). The first harm factor does not weigh heavily in favor of reversal.

Second, the trial court overruled Appellant's objection and so did not take any "curative measures." *See Brown*, 270 S.W.3d at 573. We note, however, that after the trial court overruled Appellant's objection, the State shifted its argument from nebulously criticizing "the defense" to explicitly criticizing "the Defense's *strategy*." (Emphasis added). This brought the State's argument closer to the line of validity. The second harm factor does not weigh heavily in favor of reversal.

Third and finally, our review of the record convinces us that, even absent this alleged misconduct, the certainty of conviction in this case was high. *See id.* The State's evidence was voluminous and compelling, and Appellant's dishonesty with hospital administrators played a key role in the State's case. Even defense counsel conceded in closing argument that Appellant "wasn't honest" with hospital administrators when they asked him to account for his role in Kalina's crash. So in our view, even if the State had not accused defense counsel of "misdirection and deception," the jury would still have taken the evidence of Appellant's dishonesty into account in deliberating Appellant's guilt. The third harm factor weighs heavily against reversal.

Balancing these factors, we conclude that the trial court's ruling did not affect Appellant's substantial rights. TEX. R. APP. P. 44.2(b). Point of error seven is overruled.

**RIGHT AGAINST SELF-INCRIMINATION**

In two points of error, Appellant contends that the State "introduced recorded phone calls" (point of error eight) and "impermissibly elicited testimony" (point of error nine) highlighting the fact that Appellant did not testify at the punishment phase of trial.

At punishment, the State signaled that it intended to offer audio recordings of phone calls Appellant had made from the Smith County Jail just hours after the jury returned its verdict finding him guilty of capital murder. In response, Appellant filed a written "Motion to Suppress Jail Phone Calls." The motion alleged that, by "eavesdropp[ing] on" Appellant's "private conversations," the State had violated his "Fourth and Fourteenth Amendment right to privacy" and his Fourteenth Amendment "right to equal protection of the law." At a hearing on the motion, Appellant explained that his argument was "primarily . . . based on equal protection grounds." In Appellant's view, the practice of recording outgoing calls from jail facilities "treat[ed] rich people and indigent people differently," and so violated the Equal Protection Clause. The trial court denied the motion but granted Appellant "a running objection to the jail phone calls . . . for preservation purposes."

Ultimately, the State offered into evidence a compact disc containing audio recordings of four phone calls Appellant made from the Smith County Jail. After Appellant "renew[ed]" his "objections previously made," the trial court stated, "Overruling the objections. Granted the request to a running objection. The document—or the disc will be admitted."

The first recording is a phone call Appellant made to his brother, Ken Davis, in which Appellant told his brother, "Obviously, I'd rather [get] life without parole and die when God decides to take me." The remaining recordings are phone calls Appellant made to his ex-wife, Alana Davis. In one of these calls, Alana urged Appellant to "take the stand" at punishment "and take the time to apologize to these victims and their families." The conversation continued:

> ALANA: . . . what you did was really wrong.

> APPELLANT: It was. I'm not even gonna lie to you. I know it was. And I've asked God for forgiveness. But I think the right thing is what you just said. I think to be fully repentful [sic], and fully forgiving, I think I have to take—

> ALANA: You mean, and give a confession?

> APPELLANT: Right.

This recording concludes with Appellant asking, "Do you want me to testify?"

The State published these recordings piecemeal when questioning Tyler Police Department Detective Jeff Roberts. As it published the recordings, the State periodically asked Detective Roberts to testify about his impressions of what he and the jury had just heard. As relevant to these points of error, Roberts testified about an excerpt from one of Appellant's conversations with Alana in which Appellant became "emotional." In Roberts's view, Appellant became emotional talking about "[h]imself," rather than the victims in this case. Further, while the State was

publishing Appellant's conversation with his brother, the following exchange occurred:

> Q. [By the prosecutor] Detective Roberts, in your experience as a detective, is there a—have you found a difference between people who are sorry they did something versus sorry they got caught?
>
> A. Absolutely.

Appellant did not object to Roberts's testimony.

Appellant did not testify at the punishment phase. After the charge conference, when discussing closing arguments, the trial court stated, "I know y'all are—y'all are more skilled than I am and have no doubt thought about it, but given the phone call that was made, I just hope we're—we're cautious about how we reference comments by the Defendant without getting into a comment on his decision not to testify." The State assured the trial court that, "[I]f we comment on the Defendant's statements, it would be in reference to the call specifically . . . and not outside of that." At closing argument, the State urged the jury:

> [D]on't be fooled by that fake repentance that you heard in the phone call to Alana. True remorse and true repentance is admitting what you did. Not saying, oh, it was an accident. . . So don't be fooled by that. There's no remorse in what he told Alana. None. Woe is me. He turned those tears off and on, on a dime. He's upset he got caught.

Appellant did not object to this argument.

On appeal, Appellant contends that "by introducing Alana Davis's statements and eliciting testimony" from Detective Roberts, the State accomplished what the Fifth Amendment would otherwise prohibit it from doing in closing argument: comment on Appellant's failure to testify. *See Canales v. State*, 98 S.W.3d 690, 695 (Tex. Crim. App. 2003) ("Prosecutorial comment that refers to an accused's failure to testify violates the accused's Fifth Amendment right against compelled self-incrimination."); *see also Dinkins v. State*, 894 S.W.2d 330, 356 (Tex. Crim. App. 1995) (reasoning that "testimony regarding a defendant's contrition or remorse" may violate the Fifth Amendment prohibition against self-incrimination "because such testimony can only come from the defendant"). But Appellant did not present these arguments to the trial court. Therefore, he failed to preserve error. TEX. R. APP. P. 33.1(a).

Appellant posits that "[d]efense counsel's timely objection to the admission of the calls and running objection on constitutional grounds properly preserved the error for appellate review." He is mistaken. To preserve error for appellate review, "[t]he point of error on appeal must comport with the objection made at trial." *See, e.g.*, *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012). Here, the tenor of Appellant's objection was that the recordings violated his Fourth Amendment right to privacy and his Fourteenth Amendment right to equal

protection, not his Fifth Amendment right against self-incrimination. Appellant's objection did not preserve the latter argument for appellate review.

As a fallback, Appellant suggests that his Fifth Amendment concerns were "apparent to all parties given the context." *See Lankston v. State*, 827 S.W.2d 907, 908 (Tex. Crim. App. 1992) ("We have long held that, where the correct ground for exclusion was obvious to the judge and opposing counsel, no waiver results from a general or imprecise objection." (internal quotation marks omitted)). We are unpersuaded. Appellant's motion to suppress expressly directed the trial court's attention to two constitutional concerns unrelated to the Fifth Amendment right against self-incrimination. When arguing this motion, Appellant characterized it as being "primarily . . . based on equal protection grounds." Under these circumstances, we cannot say that it would have been "apparent to all parties" that Appellant was actually concerned about his Fifth Amendment rights.

True, the trial court would later bring up "the phone call that was made" while admonishing the State to be "cautious about how [it] reference[d] comments by the Defendant without getting into a comment on his decision not to testify." But this comment was made in relation to the State's closing argument, not the admission of evidence. This remark does not show that the trial court "obvious[ly]" understood Appellant's earlier objection (which by Appellant's own

admission was based "primarily" on equal protection) to encompass the Fifth Amendment right against self-incrimination. *See id.*

Finally, Appellant did not object to Detective Roberts's punishment phase testimony on any basis. Under these circumstances, nothing is preserved for our review. *See* TEX. R. APP. P. 33.1(a). Points of error eight and nine are overruled.

**CONSTITUTIONAL CHALLENGES**

In points of error ten through twelve, Appellant challenges the constitutionality of Texas's death penalty scheme, *see* Art. 37.071, § 2, and the trial court's implementation of that scheme, in its punishment phase jury instructions.

In point of error ten, Appellant complains that the trial court "erred in failing to define the impermissibly overbroad phrase 'a probability' as it appears in the future-dangerousness special issue question." Assuming Appellant preserved this complaint for appellate review, his argument lacks merit. We have previously held, in the context of an Eighth and Fourteenth Amendment challenge, that a trial court need not "define the term 'probability' as used in the first special issue." *Russeau v. State*, 291 S.W.3d 426, 434 (Tex. Crim. App. 2009). Whether Appellant's argument is understood as a vagueness challenge or an overbreadth challenge, Appellant has not persuaded us that our prior holdings were incorrect. *See, e.g.*, *Coble v. State*, 330 S.W.3d 253, 287 (Tex. Crim. App. 2010) (rejecting a

claim that "the statutory 'future dangerousness' special issue is unconstitutional" because the term "probability" is undefined). Point of error ten is overruled.

In point of error eleven, Appellant argues that Article 37.071, Section 2(f)(4) is facially unconstitutional because it "improperly narrows the Eighth Amendment concept of 'mitigation' to factors rendering a capital defendant less morally 'blameworthy' for his crime." But we have repeatedly rejected such arguments. *See Coble*, 330 S.W.3d at 296; *Roberts v. State*, 220 S.W.3d 521, 534 (Tex. Crim. App. 2007); *Perry v. State*, 158 S.W.3d 438, 449 (Tex. Crim. App. 2004); *see also Cantu v. State*, 939 S.W.2d 627, 649 (Tex. Crim. App. 1997). Appellant counters that "this Court has yet to explain how a provision that imposes a substantive limit on what can be considered as mitigating evidence . . . can survive the sweeping language" the Supreme Court employed in *Tennard v. Dretke* in defining constitutionally relevant mitigating evidence. *See* 542 U.S. 274, 284 (2004) ("Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value."). Not so. "On at least three occasions, we have analyzed—and rejected—this argument with *Tennard* explicitly featured in our reasoning." *Hall*, 663 S.W.3d at 43 (citing *Coble*, 330 S.W.3d at 296; *Roberts*, 220 S.W.3d at 534; *Perry*, 158 S.W.3d at 449). Point of error eleven is overruled.

In point of error twelve, Appellant argues that Article 37.071, Section 2(f)(4) was unconstitutionally applied in his case. In an "as applied" challenge, the challenger "concedes the general constitutionality of the statute, but asserts that the statute is unconstitutional as applied to his particular facts and circumstances." *State ex rel. Lykos v. Fine*, 330 S.W.3d 904, 910 (Tex. Crim. App. 2011). Thus, "[a]n 'as applied' challenge is brought during or after a trial on the merits, for it is only then that the trial judge and reviewing courts have the particular facts and circumstances of the case needed to determine whether the statute or law has been applied in an unconstitutional manner." *Id.*

Under this rubric, Appellant did not preserve his "as applied" challenge for appellate review. While Appellant filed a "Motion Requesting the Court to Find Tex. Code Crim. Proc. art. 37.071 (2)(f)(4) to be Unconstitutional," he filed this motion before trial. Further, Appellant's arguments were in the nature of a facial challenge, not an "as applied" challenge. To the extent Appellant relies on this motion as having preserved error, the argument on appeal does not comport with the objection at trial. *See Clark*, 365 S.W.3d at 339.

It is true that, at the punishment phase charge conference, Appellant filed with the trial court a document styled "Defendant's Objections to the Charge at Punishment" in which Appellant "object[ed] to the Court's limitation on the

scope of mitigating evidence to that which a juror might regard as 'reducing the Defendant's moral blameworthiness.'" Appellant also orally objected at the charge conference that the trial court's instructions, which tracked Article 37.071, Section 2(f)(4), "taken literally require[d] a nexus that is prohibited by the Supreme Court."

But neither in his written objections nor his oral objections did Appellant marshal evidence tailored to "the particular facts and circumstances of the case." *See Lykos*, 330 S.W.3d at 910. Therefore, through these objections, Appellant effectively reurged his facial constitutional challenge to Article 37.071, Section 2(f)(4). So here again, the appellate argument does not comport with the trial objection. *See Clark*, 365 S.W.3d at 339. Because Appellant did not preserve error, point of error twelve is overruled.

**EVIDENCE OF FUTURE DANGEROUSNESS**

In his final point of error, Appellant asserts that the evidence was legally insufficient to support the jury's finding that, beyond a reasonable doubt, "there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Art. 37.071, § 2(b)(1), (c).

A jury may consider a variety of factors in deciding whether a defendant will pose a continuing threat to society. *See, e.g.*, *Hall*, 663 S.W.3d at 25–26. Those factors include, but are not limited to,

> (1) the circumstances of the capital offense, including the defendant's state of mind and whether he or she was working alone or with other parties; (2) the calculated nature of the defendant's acts; (3) the forethought and deliberateness exhibited by the crime's execution; (4) the existence of a prior criminal record; (5) the defendant's age and personal circumstances at the time of the offense; (6) whether the defendant was acting under duress or the domination of another at the time of the commission of the crime; (7) psychiatric evidence; and (8) character evidence.

*Id.* at 26. In determining whether there was sufficient evidence to support the jury's answer to the future dangerousness issue, we consider all the evidence at the jury's disposal, including evidence adduced at the guilt phase, and view it in the light most favorable to the jury's verdict. *See id.* Then, with the above factors and any other relevant considerations in mind, we ask whether a rational jury could have found beyond a reasonable doubt that the future dangerousness issue should be answered "yes." *See id.*

Appellant's conduct in this case, as shown by the offense of conviction, guilt phase extraneous offenses, and offenses proven at punishment, was conscience-shocking. *See Salazar v. State*, 38 S.W.3d 141, 146 (Tex. Crim. App. 2001) (weighing in favor of future dangerousness the fact that "the circumstances

of this offense were particularly heinous"). The jury could rationally have found that Appellant abused the trust placed in him by several "particularly vulnerable" people. *See Reese v. State*, 33 S.W.3d 238, 246 (Tex. Crim. App. 2000) (in answering the future dangerousness special issue, "the jury may have considered the fact that the victims were particularly vulnerable"). He did so alone, and not because of any duress or pressure. Based on the evidence, the jury could also have concluded that Appellant's actions were calculated, deliberate, and carried out with an extraordinary degree of forethought.

It is true, as Appellant points out, that he did not have a "prior criminal record" (at least in terms of criminal convictions) before committing the instant capital murder. Yet there was also evidence that Appellant sexually assaulted a child when he was eighteen and threatened to "beat the living . . . shit out of" the victim's father. Further, some factfinders might regard a clean criminal record as weighing against a finding of future dangerousness because it suggests that the underlying capital murder might be unrepresentative of the defendant's character, that it was anomalous—that it was, in plain English, a "one-off." But in this case, the jury would not have acted irrationally in rejecting any such possibility. Appellant's offense was not a one-off, nor was it (in Appellant's words) "context-specific." On the contrary, the jury could rationally have determined that

Appellant murdered as many as eight people, and grievously injured five more, in different criminal transactions spanning more than a year.

Appellant counters that his offenses involved specialized medical equipment, and because he will not have access to that equipment in prison, his offenses do not demonstrate a probability of future violence. We disagree. The future dangerousness issue "focuses upon the character for violence of the particular individual, not merely the quantity or quality of the institutional restraints put on that person." *Coble*, 330 S.W.3d at 268. In other words, "this special issue focuses upon the internal restraints of the individual, not merely the external restraints of incarceration." *Id.* at 269. And precisely because Appellant's offenses involved an egregious abuse of trust and the targeting of "particularly vulnerable" victims, the jury could rationally have found that his internal restraints are inadequate to prevent a probability of future violence. *See Reese*, 33 S.W.3d at 246. For similar reasons, the jury rationally could have afforded little weight to Appellant's evidence that Texas prisons are well-equipped to alleviate the risk of violence. *See Coble*, 330 S.W.3d at 269 ("It is theoretically possible to devise a prison environment so confining, isolated, and highly structured that virtually no one could have the opportunity to commit an act of violence, but incapacitation is not the sole focus of the Legislature or of our death penalty precedents.").

We acknowledge that multiple defense witnesses spoke positively of Appellant's character. But by and large, these witnesses spoke to Appellant's character at a younger age. Meanwhile, Appellant was well into his thirties when he murdered multiple people and seriously injured several more. We are therefore unpersuaded by Appellant's character evidence, as well as his argument that "people have limited critical decision-making skills and impulse control before they reach the age of 25." The jury could have rationally concluded that Appellant's offenses were not a function of poor "impulse control," and that despite Appellant's character evidence, his demonstrated capacity for violence would not diminish as he aged.

Finally, Appellant argues that, because his offenses did not involve "physical force," they did not meaningfully contribute to a finding of future dangerousness. He suggests that "criminal acts of violence," as used in the future dangerousness issue, "requires *physical* force and harm . . . involving physical overpowering, outward destruction of the body, or excess brutality." Preliminarily, Appellant's crime involved him physically forcing air into the bodies of bedridden hospital patients. But even setting that aside, we have never construed "criminal acts of violence" as being limited to "physical force and harm," and we decline to do so today. *See, e.g.*, *O'Bryan v. State*, 591 S.W.2d 464, 480–81 (Tex. Crim. App. 1979)

(evidence sufficient to support a finding of future dangerousness where the defendant murdered the victim by poisoning him).

Viewing the totality of the evidence in the light most favorable to the jury's verdict, and bearing the above factors and other relevant considerations in mind, we cannot say that the jury's affirmative answer to the future dangerousness special issue was irrational. The evidence was legally sufficient to support the jury's verdict, and point of error thirteen is overruled.

**CONCLUSION**

We affirm the trial court's judgment of conviction and sentence of death.

Delivered: March 12, 2026

Publish